UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————

№ 06-CV-2520 (JFB) (ETB)

———————————————

PATRICIA VASSALLO, as parent and natural guardian of K.V., an infant,

Plaintiff,

VERSUS

STEPHEN LANDO individually and in his official capacity as principal of Valley Stream South
Junior/Senior High School,
MARC F. BERSTEIN individually and in his official capacity as superintendent of schools of
the Valley Stream Central High School District,
VALLEY STREAM CENTRAL HIGH SCHOOL DISTRICT,

Defendants.

———————————————

**MEMORANDUM AND ORDER**
October 31, 2008

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Patricia Vassallo (hereinafter, "plaintiff") brought this action on behalf of her son, K.V., against defendants Valley Stream Central High School District ("the District"), Stephen Lando ("Lando"), Principal of Valley Stream South Junior/Senior High School, and Marc F. Bernstein, Superintendent of the District schools, pursuant to 42 U.S.C. § 1983. This lawsuit arises from a search of K.V. conducted by defendant administrators at Valley Stream South Junior/Senior High School on February 14, 2006, while K.V. was an eleventh grade student at the school. The search consisted of a search of K.V.'s personal belongings, outer garments and parts of his person. Lando, with the authorization of Superintendent Bernstein

and with the assistance of a local law enforcement agent, conducted the search of K.V.'s belongings based on his suspicion that K.V. was involved in starting a fire that had been set that day in the third floor boys' bathroom, and then, upon finding evidence suggesting marijuana use in his backpack, searched his outer garments and parts of his person based on the suspicion that he was in possession of drugs.

Plaintiff brings claims pursuant to 42 U.S.C. § 1983 for compensatory and punitive damages alleging that the selection of her son, who is Caucasian, for a search violated his Fourteenth Amendment right to equal protection under the theory of "selective enforcement" based upon race and disability,

as well as a "class of one" theory. Plaintiff also argues that the search that ensued violated her son's Fourth Amendment protection against unreasonable search and seizure.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all claims.[1]  For the reasons that follow, defendants' motion is granted in its entirety.  In particular, it is undisputed that: (1) K.V. was in the hallway on the third floor in the vicinity of the fire shortly after the fire alarm sounded; (2) upon making eye contact with his teacher in the hallway, K.V. said nothing, put up the hood of his sweatshirt, quickened his pace, and covered the lower part of his face; (3) upon searching K.V.'s backpack for evidence related to the fire (such as matches, lighters, or an accelerant), Lando found marijuana seeds; (4) at the direction of Lando and a police officer, K.V.'s sweatshirt, shoes, and socks were removed and his shirt and pants legs lifted, but his pants and shirt were never removed; and (5) upon observing a bulge in his waistband, K.V. was directed to remove the object and K.V. removed a bag containing a small amount of marijuana from his waistband.

---

[1] Although other constitutional violations are alleged in the complaint, plaintiff made clear in her opposition papers and at oral argument that the only claims being pursued were the Fourth Amendment claim and the Equal Protection claim under theories of "class of one" and selective enforcement.  Thus, the other constitutional claims in the complaint, such as alleged due process violations, were withdrawn. (*See* Plaintiff's Memorandum of Law, at 1 ("Although, initially, Plaintiff brought Fifth and Fourteenth Amendment privacy and property claim(s), those claims are hereby voluntarily withdrawn.  On the remaining Fourteenth Amendment equal protection claims and Fourth Amendment claims, Vassallo submits that summary judgment is inappropriate, as there are numerous material issues of fact, that preclude dismissing this case as a matter of law.").)

Given these undisputed facts, the Court concludes as a matter of law that defendants are entitled to summary judgment on the Fourth Amendment claim because, under the Supreme Court's decision in *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985), the search was justified at its inception and was reasonably related in scope at all times to the circumstances that justified the intrusion.  In any event, at a minimum, defendants would be entitled to qualified immunity on this claim given these undisputed facts.

Similarly, with respect to the equal protection claim, although two unidentified non-Caucasian students were running in the hallway in the vicinity of the fire, it is undisputed that: (1) Lando did not have the names of these students at the time of incident; and (2) in the three days following the fire, Lando interviewed a number of students who (based on school documents) were out of the their classrooms at the time of the fire, including students of races different than K.V., but was not able to determine who was responsible for the fire.   Given these undisputed facts, no rational jury could conclude that K.V. was interviewed and searched on the day of the fire based upon his race (and/or his learning disability) under a theory of selective enforcement, nor is there any legal or factual basis for a "class of one" claim.    Thus, summary judgment for defendants on the equal protection claim also is warranted.  In short, although plaintiff points to a number of factual disputes that plaintiff argues preclude summary judgment, none of those factual disputes create a genuine issue for trial because, even on plaintiff's version of events, the Fourth and Fourteenth Amendment claims fail as a matter of law.

# I. FACTS

The facts related below are taken from the parties' depositions, exhibits and respective Local Rule 56.1 statement of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001).

At the time of the incident which forms the basis for plaintiff's cause of action, K.V. was an eleventh grade student at Valley Stream South Junior/Senior High School. (Defendants' Local 56.1 Statement of Material Facts ("Defs.' 56.1") ¶ 1.)[2] On February 14, 2006, K.V. was assigned to ninth period study hall, which was held in a classroom on the southeast end of the third floor of the school building. (Defs.' 56.1 ¶¶ 2-3; K.V. Dep. at 18-19, 23-24, 53; Reape Aff. Ex. C.) Shortly after the start of the ninth period, K.V. was excused from study hall to conduct research in the library, which was located on the first floor almost directly below the study hall classroom. (Defs.' 56.1 ¶¶ 4-5; K.V. Dep. at 20-21, 24-25; Reape Aff. Exs. C, D.) After completing his research some ten to fifteen minutes later, K.V. traveled to the second floor to retrieve a pen from his locker, located on the second floor in the north hallway. (Defs.' 56.1 ¶¶ 9-11; K.V. Dep. at 29-30, 33, 38-39; Reape Aff. Exs. C, D.) Two to three minutes later, K.V. then proceeded to the third floor via Stairway D, located on the northeast corner of the building. (Defs.' 56.1 ¶¶ 12-13; K.V. Dep. at 34, 38, 133; Reape Aff. Ex. C.)

Soon after the beginning of ninth period, a fire was reported in the boys' bathroom located on the north side of the third floor of the building. (Plaintiff's Local 56.1 Statement of Material Facts ("Pl.'s 56.1") ¶ 14; Lando Dep. at 51-52, 56-57; Reape Aff. Ex. C.) A Caucasian student, C.H., was walking towards that bathroom when he encountered an African-American student walking away from it. (C.H. Dep. at 25-26.) After entering the bathroom and witnessing the fire, C.H. attempted to report the fire to a teacher, Mr. Lee, who was already aware of it. (Pl.'s 56.1 ¶¶ 14-15; C.H. Dep. at 15.)[3] C.H. then returned to his classroom and reported the fire to his teacher, Ms. Lowe. (C.H. Dep. at 23.) According to plaintiff, when the fire alarm sounded, K.V. was walking up Stairway D to the third floor. (Defs.' 56.1 ¶ 18; K.V. Dep. at 40-41; Reape Aff. Ex. C.) As K.V. walked down the east corridor from the stairway toward his study hall classroom, he saw two younger male students running down the corridor from the direction of the bathroom. (Defs.' 56.1 ¶¶ 19-21; K.V. Dep. at 42-45.) K.V. identified the two students as African-American and Hispanic, respectively. (Pl.'s 56.1 ¶ 20(a); K.V. Dep. at 42-45.)

After the two students ran past K.V., he encountered a teacher, Mr. Boyd, in the east corridor. (Defs.' 56.1 ¶ 23; K.V. Dep. at 46-48.) K.V. made eye contact with Mr. Boyd,

---

[2] Where only one party's 56.1 statement is cited, the other party does not dispute the facts alleged, or there is no evidence controverting such fact, unless otherwise noted.

---

[3] Plaintiff and defendants disagree over whether Mr. Lee was aware of the fire before C.H. approached him – specifically, C.H. testified that Mr. Lee already knew of the fire when he reported it to him and Lando testified that Mr. Lee learned of the fire from C.H. (C.H. Dep. at 15; Lando Dep. at 55-56.) However, this factual dispute is immaterial for purposes of the instant motion given the other undisputed facts, for the reasons discussed *infra*.

pulled up the hood of his sweatshirt, covered the lower part of his face, quickened his pace, and proceeded to walk past him without speaking. (Defs.' 56.1 ¶¶ 26-29; K.V. Dep. at 55-57, 63-65, 67-70; Boyd Hearing Tr. at 151.)[4]

After the building was evacuated, C.H. spoke with Lando and informed him that he had seen an African-American student walking down the corridor of the third floor where the bathroom fire occurred, moments prior to discovering the fire; he did not identify the student by name. (C.H. Dep. at 25-26.) Soon thereafter, Mr. Boyd informed Lando that he had seen K.V. walking around the corner from the corridor where the fire took place and that he had also seen two younger students whom he could not identify running down that same hallway.[5] (Boyd Hearing Tr. at 154.) Lando asked Mr. Boyd to bring K.V. to his office. (Defs.' 56.1 ¶ 33; Lando Dep. at 64.) Approximately twenty minutes after the evacuation was complete, Mr.

Boyd and another teacher approached K.V. in the parking lot of school, informed him that Lando wanted to see him, and escorted him to Lando's office. (Defs.' 56.1 ¶¶ 34-36; K.V. Dep. at 70-74, 76.) Lando told K.V. at that time that he was suspected of starting the fire in the bathroom and that he intended to search his personal belongings and outer garments for evidence of K.V.'s involvement in the fire, such as matches, lighters or accelerants. (Defs.' 56.1 ¶¶ 39, 41-43; K.V. Dep. at 75-78, 89; Lando Dep. at 90-94, 100.) K.V. informed Lando that he had encountered two other students in the immediate vicinity of the fire soon after the fire alarm sounded, but could not identify them by name. (Lando Dep. at 156.) K.V. denied that he started the fire and stated that Lando had no right to search him. (Defs.' 56.1 ¶¶ 40, 44; K.V. Dep. at 77-79; Lando Dep. at 91.) Lando stated that if K.V. did not consent to the search, he would call a police officer to conduct the search by force. (Defs.' 56.1 ¶ 45; K.V. Dep. at 78, 87, 108.)

When K.V. refused to consent to the search, a law enforcement officer, Officer Marc A. Howell of the Nassau County Police Department, was called to Lando's office. (Defs.' 56.1 ¶ 46; K.V. Dep. at 90.) K.V. then gave his backpack to Lando because he felt he had no choice in the matter, and Lando searched the backpack after the police officer had arrived. (Defs.' 56.1 ¶¶ 47-48; K.V. Dep. at 87-91, 95.) Lando, upon looking inside the backpack, discovered marijuana seeds. (Defs.' 56.1 ¶¶ 51-52; K.V. Dep. at 95, 120; Lando Dep. at 102.) Lando also recovered rolling papers from K.V.'s belongings.[6] (K.V. Dep. at

---

[4] Although it is undisputed that K.V. covered his lower face, there is disagreement between parties over what K.V. used to cover the lower part of his face – that is, plaintiff maintains he used his hand to cover his nose and mouth and defendants submit that he used the hood of his sweatshirt. (Pl.'s 56.1 ¶ 28; K.V. Dep. at 42-45, 55-59, 63-65.) However, this factual dispute is immaterial for purposes of the instant motion given the undisputed facts, for the reasons discussed *infra*.

[5] Though Mr. Boyd stated he also told Lando about the two other unidentified students running down the hall in the vicinity of the fire, Lando does not recall Mr. Boyd relaying that information to him. (Boyd Hearing Tr. at 154; Lando Dep. at 64-65.). Similarly, although plaintiff argues that C.H. denies ever telling Lando that he saw K.V. by the bathroom (while Lando claims that C.H. did), that dispute is immaterial because it is undisputed that Mr. Boyd reported K.V.'s conduct to Lando and it is undisputed that K.V., in fact, did the things that Mr. Boyd reported.

---

[6] Though there is a dispute over whether Lando recovered the rolling paper in the backpack, or later when he searched K.V.'s wallet, this dispute is immaterial for purposes of the summary judgment motion for the reasons discussed *infra*.

95, 120; Lando Dep. at 102, 118-19.) Lando had suspended K.V. for marijuana use in the past. (Defs.' 56.1 ¶ 55; P. Vassallo Dep. at 23-27.) The discovery of the seeds led Lando to suspect that K.V. was in possession of marijuana; accordingly, he told K.V. that he was going to further search him. (Defs.' 56.1 ¶¶ 54, 56; K.V. Dep. at 89, 95, 97, 122; Lando Dep. at 103.) K.V. protested this search. (Defs.' 56.1 ¶ 57; K.V. Dep. at 97-98.)

K.V.'s guidance counselor, Mr. Corsantino, called his mother and asked her to come to the school. (Defs.' 56.1 ¶ 58; K.V. Dep. at 98.) K.V. did not ask that the search be delayed until his mother was present, and it proceeded before her arrival. (Defs.' 56.1 ¶¶ 59-60; K.V. Dep. at 123, 124-27.)

According to K.V., Lando told him the following: "Lando said he wanted to search my person and he said he wants to take my shoes off, lift up my legs, lift up my shirt, take my socks off and all of that, and I didn't want to." (K.V. Dep. at 99.) Officer Howell was present for this search and, according to K.V., told him that he needed to follow Lando's instruction or he would be forcibly searched. (*Id*. at 106-08.) Thus, at the direction of Lando and Officer Howell, K.V. removed his shoes, socks and sweatshirt. (Defs.' 56.1 ¶¶ 66, 68-69; K.V. Dep. at 100-01, 103-05, 108; Lando Dep. at 112.) Officer Howell lifted up K.V.'s pants legs to expose his lower legs.[7]

_____

[7] Plaintiff has provided differing accounts as to whether K.V., Lando or Officer Howell lifted K.V.'s pants legs; plaintiff first admits that K.V. lifted up his pants leg at the direction of Officer Howell (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67), but later states that "P.O. Howell lifted up [K.V.'s] pant leg . . . ." (Pl.'s 56.1 ¶ 68.) K.V. testified thus:

Q: Does anybody physically touch you?

(Pl.'s 56.1 ¶¶ 68-69; K.V. Dep. at 106-09.) Officer Howell and Lando directed K.V. to lift the bottom of his t-shirt to expose his waistband. (K.V. Dep. at 112.) K.V. felt that this order constituted a strip search. (*Id*. at 113-17.) After K.V. lifted his shirt, Lando spotted a bulge just below the waistband of K.V.'s boxer shorts. (Defs.' 56.1 ¶ 71; Lando Dep. at 113.) Lando and Officer Howell then instructed K.V. to remove the object causing the protrusion. (Defs.' 56.1 ¶ 73; Lando Dep. at 113-15; K.V. Dep. at 112-17.) K.V. denied that he had anything in his waistband and then

_____

A: Yes. I believe so.
Q: Who?
A: Dr. Lando.
Q: Where does he touch you?
A: Like when I had to lift up my legs, like my pants – I think he – I don't even remember.

K.V. Dep. at 100.

Q: Well, you said that someone touched you in some way when you lifted your pants leg; who was that?
A: I think the cop was just like trying to see what I had there.
. . .
Q: Do you remember anyone in that room physically touching you as part of what you call the search?
A: I think the cop lifted my pants up and started touching me. Touching my clothes..

(*Id*. at 107.) However, the resolution of this factual issue is immaterial for purposes of the instant motion because, regardless of who lifted the pants leg, the defendants' conduct (including the lifting of the pants leg) was justified under the Fourth Amendment as a matter of law for the reasons discussed *infra*.

refused to remove said object. (Defs.' 56.1 ¶ 75; K.V. Dep. at 112-13; Lando Dep. at 115.) After a few minutes of back and forth between K.V. and Lando regarding whether he would remove the object or not, K.V. withdrew a bag that contained other small bags of marijuana from his waistband. (Defs.' 56.1 ¶ 77; K.V. Dep. at 114-16; Lando Dep. at 115-16.) Officer Howell arrested K.V. for possession of marijuana. (Defs.' 56.1 ¶ 79; K.V. Dep. at 128-29; Lando Dep. at 121.)

In the three days following the fire, Lando obtained the identities of all students who were out of their classrooms at the time of the fire and conducted interviews and/or obtained written statements from at least eight such students, including two students who were African-American. (Lando Dep. at 133-46). Lando, however, was unable to determine who started the fire from this additional investigation.

## II. PROCEDURAL HISTORY

On May 8, 2008, defendants filed the instant motion for summary judgment. Plaintiff submitted her opposition to the motion on July 21, 2008. Defendants submitted a reply to plaintiff's opposition on July 31, 2008. Oral argument was held on October 3, 2008.

## III. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The

moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). In particular, "the moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle him to judgment as a matter of law." *Connecticut Criminal Defense Lawyers Ass'n v. Forst (In re State Police Litig.)*, 88 F.3d 111, 123 (2d Cir. 1996) (citation omitted). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial

is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). "[W]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'shp*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

Defendants make several arguments in support of their motion for summary judgment: (1) there is insufficient evidence for the equal protection claim of discrimination based on race and/or disability to survive summary judgment; (2) there is insufficient evidence for an equal protection "class of one" claim to survive summary judgment; (3) based upon the undisputed facts, the search of K.V. was justified at its inception and reasonable in its scope under the Fourth Amendment; and (4) Lando and Bernstein are entitled to qualified immunity on the Fourth Amendment claims. For the reasons set forth below, the Court agrees and grants defendants' motion on all claims.

## A. Equal Protection Claims

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat all similarly situated individuals alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Here, plaintiff brings claims pursuant to the Equal Protection Clause under two different theories: "selective enforcement" and "class of one."[8] (*See* Plaintiff's Memorandum of Law, at 17 ("Plaintiff has averred two Equal Protection Claims, pursuant to the Fourteenth Amendment. The first claim is a bad faith selective prosecution claim, based on impermissible race plus disability considerations. Secondly, Plaintiff also claims a 'Class of One' Equal Protection Claim.").)

## 1. Selective Enforcement

Plaintiff brings an equal protection "selective enforcement" claim, pursuant to *Le Clair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980), arguing that Lando overlooked the other students present in the vicinity of the fire and chose to question and search only K.V. on account of his race and/or disability. However, as set forth below, no rational jury could find in favor of defendant based upon the undisputed facts in this case and, thus, such claim cannot survive summary judgment.

## a. Legal Standard

It is well settled that plaintiffs must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment. *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007).

---

[8] Although the "class of one" claim first arose in plaintiff's letter to the Court filed on February 8, 2008 and is not specifically mentioned in plaintiff's complaint, for purposes of ruling on defendants' motion for summary judgment, the Court will construe it as a part thereof and finds that it fails as a matter of law based upon the undisputed facts, for the reasons discussed herein.

i. Similarly Situated[9]

First, plaintiff must demonstrate that he "was treated differently from other similarly situated [individuals]." *Id.* (citations and quotation marks omitted); *see also Church of the Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004) ("A selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated."). In particular, at the summary judgment stage, a "plaintiff must present evidence comparing [himself] to individuals that are 'similarly situated in all material respects.'" *Sebold v. City of Middletown*, No. 3:05 civ 1205, 2007 U.S. Dist. LEXIS 70081, at *81 (D. Conn. Sept. 21, 2007) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Finally, when a plaintiff attempts to prove selective enforcement "on the basis of his race, he 'must show that similarly situated individuals of a different race were not [subjected to the offensive conduct].'" *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).

Further, "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) (explaining that the above-referenced "rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could

find the similarly situated prong met"); *accord Kirschner v. Zoning Bd. of Appeals*, 924 F.Supp. 385, 394 (E.D.N.Y. 1996).

ii. Impermissible Considerations

With respect to the second prong, the Second Circuit has held that a plaintiff must demonstrate that the "differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc.*, 507 F.3d at 790 (citations and quotation marks omitted); *see also Freedom Holdings, Inc. v. Int'l Tobacco Partners, Ltd.*, 357 F.3d 205, 234 (2d Cir. 2004) ("To establish a violation of the Equal Protection Clause based on selective enforcement, a plaintiff must ordinarily show the following: '(1) [that] the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'") (quoting *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999)). "To prevail, plaintiffs must prove that the disparate treatment was caused by the impermissible motivation." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005); *see also Crowley v. Courville*, 76 F.3d 47, 53 (2d Cir. 1996) (stating that a "demonstration of different treatment from persons similarly situated, without more, would not establish malice or bad faith").

b. Application

With respect to the "similarly situated" element of a selective enforcement claim, after reviewing the record in the light most

---

[9] Although one district court in the Second Circuit has stated that "the standard for 'similarly situated' when bringing a selective enforcement claim is the same as in a 'class of one' claim," *Dones v. City of New York*, No. 07 civ 3085, 2008 U.S. Dist. LEXIS 53681, at *28 (S.D.N.Y. July 9, 2008), the Court employs the slightly different formulations set forth by the Second Circuit for each claim.

favorable to plaintiff and drawing all reasonable inferences in her favor, the Court concludes that the plaintiff has failed to raise a genuine issue of material fact over whether K.V. was similarly situated to the three other students that Lando was told were located near the bathroom fire at the time that it occurred, specifically, C.H. and the two other students spotted running down the corridor.

First, with respect to C.H., no rational jury could find that he is similarly situated to K.V. because C.H. reported the fire to a teacher. More importantly, a rational jury could not possibly conclude that the defendants' decision to interview and search K.V., and not C.H., was based upon race because C.H., like K.V., is Caucasian. Therefore, even assuming *arguendo* that they were similarly situated, it is clear that the differing treatment could not provide support for an equal protection claim based on race.

Plaintiff's effort to argue that the two non-Caucasian students who were running in the hallway at the time of the fire alarm were similarly situated also is without merit. As an initial matter, although these two students were in the vicinity of the fire and were running, their behavior was clearly different than K.V.'s, who made eye contact with a teacher and then hastened his pace, put his hood up, and partially covered his face. In any event, even assuming *arguendo* a rational jury could characterize the running students as displaying conduct equally suspicious to that of K.V., those two students were not similarly situated to K.V. because no one provided the identity of those students to the principal on the day of the fire. In other words, it is undisputed that the teacher who spotted K.V. and the other two students identified K.V. to Lando by name, but he could not identify the other two students. (Lando Dep. at 64; Boyd Hearing Tr. at 154.) Similarly, although plaintiff told Lando that he had observed two students,

one African-American and one Hispanic, running in the vicinity of the fire, K.V. could not identify them by name or provide any details of a description. (Lando Dep. at 157-58.) Given these undisputed facts, including the fact that the principal was not provided the identity of these two other students, no rational jury could conclude that these two unidentified students were similarly situated to K.V., whose identity and suspicious behavior were provided to Lando in the immediate aftermath of the fire. In short, as a matter of law, K.V. was not similarly situated to the other two students, as his identity was known to Lando and the identity of the other two were not. *See, e.g., Cleveland v. Blount County Sch. Dist.*, No. 05 civ 380, 2008 WL 250403, at *9 (E.D. Tenn. Jan. 28, 2008) (summary judgment warranted because plaintiff had not presented sufficient evidence of similarly situated Caucasian students being treated differently from the plaintiffs by the school district).

Just as plaintiff has failed to raise a genuine issue of material fact on the "similarly situated" prong of the selective enforcement claim, plaintiff has also failed to present evidence by which a rational jury could infer any "impermissible considerations" on the part of Lando in choosing to question and search K.V., even construing the facts in the light most favorable to the plaintiff. As noted above, it is undisputed that Lando knew the identity of only one of the three individuals spotted in close proximity to the bathroom fire and so K.V. is the individual that he chose to search and question in the immediate aftermath of the event. Moreover, any potential claim that the decision to interview/search K.V. was motivated by race is further eviscerated by the undisputed fact that, in the three days following the fire, Lando obtained the identity of all students who were out of their classrooms at the time of the fire and

conducted interviews and/or obtained written statements from at least eight such students, including two students who were African-American.[10] (Lando Dep. at 133-46.) Therefore, given these undisputed facts, no rational jury could conclude that the decision to interview/search K.V. was based upon his race – namely, that he is Caucasian – or any other impermissible consideration, including malice or bad faith.[11]

Accordingly, defendants' motion for summary judgment on plaintiff's "selective enforcement" equal protection claim is granted.

2. "Class of One"

Plaintiff also brings a "class of one" claim, asserting that Lando singled K.V. out for questioning and search from others similarly situated without a rational basis to do so, in violation of his Fourteenth Amendment right to equal protection. As set forth below, the "class of one" claim cannot survive summary judgment.

a. The *Engquist* Decision

As a threshold matter, this Court concludes that the Supreme Court's recent decision in *Engquist v. Or. Dep't of Agric. County Comm'n of Webster County*, 128 S. Ct. 2146 (2008) would foreclose a "class of one" claim by plaintiff in connection with the discretionary decision by school administrators in this case as to whether a student should be interviewed and searched for evidence of criminal activity. As discussed below, although *Engquist* dealt with discretionary decisions in the public employment context, its analysis and rationale clearly applies to discretionary determination by decision-makers in other contexts, such as the one in the instant case.

---

[10] Although plaintiff argues that differing treatment was demonstrated by the fact that these other students who were interviewed were not searched like K.V., that argument is completely without merit. It is obvious that, unlike K.V. who was interviewed/searched *in the immediate aftermath of the fire*, students who were interviewed one or more days later (and only because they were out of their classrooms at the time of the fire) would not be subject to the same search as K.V.

[11] At oral argument, plaintiff's counsel also asserted in a conclusory fashion a "selective enforcement" claim based on disability – namely, K.V.'s learning disability. As a threshold matter, the Equal Protection claim in the complaint was only based on race, not disability. (Compl. ¶ 94.) Moreover, the opposition to the motion mentions disability in the most cursory fashion (*see* Plaintiff's Memorandum of Law, at 17), with absolutely no legal or factual analysis. Thus, the Court notes that plaintiff's failure to include these allegations in the complaint renders such allegations improper. *See, e.g., Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*, 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion."); *see also DeFilippo v. N.Y.S. Unified Court Sys.*, No. 06 civ 1561, 2007 WL 1174135, at *1 (2d Cir. Apr. 19, 2007) ("[T]he District Court did not abuse its discretion in prohibiting DeFilippo from raising a due process claim for the first time in his opposition to defendants' summary judgment

---

motion."). In any event, any such disability claim under the Equal Protection Clause also fails on the merits because, among other things, there is no evidence whatsoever to support a rational jury concluding that K.V. was interviewed and searched because of his learning disability. In short, any such claim, to the extent it is being asserted, is frivolous given the complete lack of evidence to support it.

In *Engquist*, the Supreme Court addressed "class of one" claims and declined to apply this doctrine in the context of public employment. The *Engquist* Court reasoned that "[if] plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim." *Id.* at 2156. Although the *Engquist* decision was applied in the context of public employment, the court finds the following analysis by the Supreme Court, regarding the scope of its prior decision in *Willowbrook v. Olech,* 528 U.S. 562, 564 (2000), to be instructive to the instant matter:

> Recognition of the class-of-one theory of equal protection on the facts in *Olech* was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle. That case involved the government's regulation of property. Similarly, the cases upon which the Court in *Olech* relied concerned property assessment and taxation schemes. *We expect such legislative or regulatory classifications to apply "with respect to person,"* to borrow a phrase from the judicial oath. As we explained long ago, the Fourteenth Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed."

****

> What seems to have been significant in *Olech* and the cases on which it relied was *the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed.* There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations – at least not with regard to easement length, however typical such determinations may be as a general zoning matter. Rather, the complaint alleged that the board consistently required only a 15-foot easement, but subjected *Olech* to a 33-foot easement. This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it.

*Engquist*, 128 S. Ct. at 2153-54 (emphasis added) (internal citations omitted). The Court also refers to two cases – *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County*, 488 U.S. 336 (1989) and *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923) – that represent the "clear standard" present in *Olech*, stating:

> In *Allegheny Pittsburgh*, cited by the *Olech* Court, the applicable standard was market

value, but the county departed from that standard in basing some assessments on quite dated purchase prices. Again, there was no suggestion that the "dramatic differences in valuation" for similar property parcels, were based on subjective considerations of the sort on which appraisers often rely. *Sioux City Bridge*, also cited in *Olech*, was the same sort of case, recognizing an equal protection claim when one taxpayer's property was assessed at 100 percent of its value, while all other property was assessed at 55 percent, without regard to articulated differences in the properties.

*Engquist*, 128 S. Ct. at 2154. The *Engquist* Court then contrasted the above-referenced line of cases with those that entail "discretionary" decisions, where the "class of one" theory of equal protection does not apply:

There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Suppose, for example that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself – the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the

discretion inherent in the challenged action. There is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

*Id.*

Thus, although the Supreme Court noted that "[t]his principle applies most clearly in the employment context," the Court's analysis does not limit its findings to purely employment cases, as evidenced by the traffic ticket example discussed above.

In fact, the situation in the instant case is closely analogous to the situation outlined by the *Engquist* Court in the traffic ticket hypothetical. In other words, the decision by defendants as to which students should be interviewed and/or searched regarding the fire is "subjective and individualized." *Id.* As principal of Valley Stream Junior/Senior High School and superintendent of the school district to which that school belongs, respectively, Lando and Bernstein are charged with "custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). Decisions that defendants make on a day-to-day basis to ensure the safety and welfare of the students under their care are necessarily discretionary ones; they must have the leeway to single out certain students for questioning when a disciplinary situation arises. Because Lando and Bernstein acted within their discretionary powers as Principal and Superintendent when questioning and searching K.V., plaintiff's "class of one" equal protection claim must fail. Moreover, unlike an allegation that the decision was based on an impermissible classification such as race or gender, plaintiff's "class of one" claim here does not invoke the fear of improper

classification. Instead, as noted in *Engquist*, it simply "challenges the legitimacy of the underlying action itself" – namely, the school's decision to interview and search a student such as K.V. under these circumstances. Accordingly, unlike plaintiff's equal protection claim based on race (discussed *supra*), the analysis in *Engquist* appears to foreclose as a matter of law a "class of one" claim to the discretionary decisions at issue in the instant case. *See, e.g., United States v. Moore*, No. 07 civ 3770, 2008 WL 4149755, at *8 (7th Cir. 2008) (applying *Engquist* to challenges to decisions of prosecutorial discretion and noting "a class-of-one equal protection challenge, at least where premised solely on arbitrariness/irrationality, is just as much a 'poor fit' in the prosecutorial discretion context as in the public employment context"); *Bissessur v. Indiana Univ. Bd. of Trustees*, No. 1:07 civ 1290 (SEB) (WTL), 2008 WL 4274451, at *9 (S.D. Ind. Sept. 10, 2008) (applying *Engquist* to class-of-one claim challenging the school's decision to expel plaintiff and noting "[t]he Supreme Court's rationale in *Engquist* effectively forecloses his claim").

However, because the Second Circuit has yet to decide the reach of *Engquist* outside the public employment context, this Court proceeds to analyze the merits of plaintiff's "class of one" claim and concludes that it cannot survive summary judgment.

b. Legal Standard

In *Prestopnik v. Whelan*, the Second Circuit explained the difference between "class of one" equal protection claims and more traditional equal protection claims:

"The Equal Protection Clause requires that the government

treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). While this clause "is most commonly used to bring claims alleging discrimination based on membership in a protected class," it may also be used to bring a "class of one" equal protection claim. *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In a "class of one" case, the plaintiff uses "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff... to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose – whether personal or otherwise – is all but certain." *Neilson*, 409 F.3d at 105.

No. 06 civ 3186, 2007 U.S.App. LEXIS 19612, at *3-*4 (2d Cir. Aug. 16, 2007); *see also King v. New York State Div. of Parole*, No. 05 pr 1860, 2008 U.S. App. LEXIS 875, at **11 (2d Cir. Jan. 16, 2008) ("In [*Olech*], the Supreme Court recognized the viability of an Equal Protection claim 'where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'") (quoting *Olech*, 528 U.S. at 564). In particular, as the Court sets forth below, in order to prevail on a class of one claim, a plaintiff must demonstrate that: (1) he was treated differently from a similarly situated individual; and (2) the

differential treatment was arbitrary and irrational.

### i. Similarly Situated

First, in order to prevail on a class of one claim,

> the plaintiff "must demonstrate that [[h]e was] treated differently than someone who is prima facie identical in all relevant respects." *Neilson*, 409 F.3d at 104 (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). This requires a showing that the level of similarity between the plaintiff and the person(s) with whom she compares herself is "extremely high"- so high (1) that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy," and (2) that "the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson*, 409 F.3d at 104-05.

*Prestopnik*, 2007 U.S. App. LEXIS 19612, at *4-*5; *see also Doninger v. Niehoff*, 527 F.3d 41, 53 (2d Cir. 2008) ("[A] class-of-one plaintiff must show . . . an 'extremely high degree of similarity between [himself] and the persons to whom [he] compare[s] [himself]' in order to succeed on an equal protection

14

claim.") (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)); *King*, 2008 U.S.App. LEXIS 875 at **11 (explaining that, subsequent to *Olech*, the Second Circuit has "held that 'the level of similarity between [class of one] plaintiffs and the persons with whom they compare themselves must be extremely high.'") (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)); *Clubside, Inc.*, 468 F.3d at 159 ("We have held that class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves. This showing is more stringent than that used at the summary judgment stage in the employment discrimination context.") (citation omitted); *Pina v. Lantz*, 495 F. Supp. 2d 290, 304 (D. Conn. 2007) ("[T]he Second Circuit has left no doubt that a [class of one] plaintiff must meet a high threshold to move beyond summary judgment. Specifically, for a plaintiff to demonstrate that he or she was treated differently from similarly situated individuals in an irrational manner, in violation of the Fourteenth Amendment, the plaintiff must demonstrate that he or she is *prima facie* identical to the comparators.") (citation and quotation marks omitted). Further, "[g]enerally, whether two [individuals] are similarly situated is a factual issue that should be submitted to the jury." *Cine SK8, Inc.*, 507 F.3d at 790-91 (noting that "rule is not absolute and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met") (citations and quotation marks omitted); *Clubside, Inc.*, 468 F.3d at 159 (explaining that, "[g]enerally, whether parties are similarly situated is a fact-intensive inquiry," although "a court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated").

ii. Irrational and Arbitrary Basis

Additionally, the plaintiff must demonstrate "that the defendant intentionally treated [him] differently, with no rational basis." *Prestopnik*, 2007 U.S. App. LEXIS 19612, at *5; *see also Price v. City of New York*, No. 06 civ 3481, 2008 U.S. App. LEXIS 3133, at **2 (2d Cir. Feb. 13, 2008) ("To prevail on a 'class of one' selective treatment claim without asserting membership in a protected class, Price must demonstrate, *inter alia*, that the defendants *intentionally* treated him differently from others similarly situated without any rational basis.") (emphasis in original); *Siao-Pao v. Connolly*, 564 F. Supp. 2d 232, 245 (S.D.N.Y. 2008) ("This Court has interpreted the *Olech* standard to require that differential treatment be both intentional and irrational to satisfy the class of one standard."); *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 n. 7 (S.D.N.Y. 2008) (explaining that, in contrast with selective enforcement claims, which require "showing of animus or 'malicious or bad faith intent,'" class of one claims are based on "'irrational and wholly arbitrary' governmental conduct").[12]

c. Application

_____

[12] The Court is aware that the Second Circuit has not resolved the issue of whether plaintiffs bringing class of one claims must also demonstrate the "malice or bad faith" required in a selective enforcement claim, described *infra*. *See Prestopnik*, 2007 U.S. App. LEXIS 19612, at *5 n. 1; *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 n. 7 (S.D.N.Y. 2008) ("[T]he Second Circuit has repeatedly deferred the question of whether *Olech* eliminated the inquiry into defendant's bad faith intent . . . ."). However, because the Court has found – as stated *infra* – that plaintiff's claim fails to survive summary judgment on other grounds, the Court need not address this issue.

As stated above, plaintiff has failed to raise a genuine issue of material fact over whether K.V. was similarly situated to the other three students spotted in close proximity to the bathroom fire. The same holds true for the question of whether Lando, in deciding to search K.V. but not the other individuals, acted in an irrational or arbitrary manner, as the undisputed facts demonstrate that of the three students spotted behaving suspiciously in close proximity to the bathroom fire, Lando only knew the identity of one of those students, K.V. Therefore, given such undisputed facts, no rational jury could conclude that it was irrational or arbitrary to only bring K.V. into his office for questioning and a search in the immediate aftermath of the fire.

### B. Fourth Amendment Claims

Defendants argue that the undisputed facts demonstrate that the search of K.V. was reasonable as a matter of law under the Fourth Amendment. The Court agrees. As set forth below, analyzing plaintiff's claims regarding the search pursuant to the standard for searches of students in schools established by the United States Supreme Court, the Court concludes that plaintiff has failed to raise any material issues of fact as to the reasonableness of the search of K.V.'s belongings, his items of clothing, or parts of his physical person.

### 1. Legal Standard

It is axiomatic that the "[Fourth] Amendment's prohibition on unreasonable searches and seizures applies to searches conducted by public school officials." *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). However, it is also well-settled that "'while children assuredly do not shed their constitutional rights . . . at the schoolhouse gate, . . . the nature of those rights is what is appropriate for children in school.'" *Morse v.*

*Frederick*, 127 S. Ct. 2618, 2627 (2007) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995) (internal quotations omitted)) (omissions in original). Thus, "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O.*, 469 U.S. at 340. Specifically, "school officials need not obtain a warrant before searching a student who is under their authority." *Id*. Moreover, the "special needs" of the public school environment do not require strict adherence to the probable cause requirement:

> [T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.

*T.L.O.*, 469 U.S. at 341; *see also Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 829 (2002) ("'[S]pecial needs' inhere in the public school context."); *Vernonia*, 515 U.S. at 656 ("Fourth Amendment rights, no less than First and Fourteenth Amendment rights are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children. For their own good and that of their classmates, public school children are

routinely required to submit to various physical examinations, and to be vaccinated against various diseases.").

The *T.L.O.* Court established a two-part inquiry to determine whether a search conducted by school officials is reasonable in the school setting: "first, one must consider 'whether the . . . action was justified at its inception[;]' . . . second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" 469 U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. at 20.)) The Court noted:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*T.L.O.*, 469 U.S. at 341-42 (footnotes omitted).

Thus, under *T.L.O.*, a search will ordinarily be justified at its inception if it is supported by reasonable suspicion.[13] "The requirement of

reasonable suspicion is not a requirement of absolute certainty but only of sufficient probability." *Phaneuf v. Fraikin*, 448 F.3d 591, 596 (2d Cir. 2006).

The *T.L.O.* Court made clear that it was only addressing the situation involving searches conducted by school authorities acting on their own and was expressing no view regarding searches conducted by school officials in conjunction with, or at the direction of, law enforcement. *See T.L.O.*, 469 U.S. at 341, n. 7 ("We here consider only searches carried out by school authorities acting alone and on their own authority. This case does not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and we express no opinion on that question."). Accordingly, plaintiff argues to this Court that the higher "probable cause" standard should apply to the search of K.V. in which law enforcement participated. Although the Second Circuit has thus far not addressed what

_____

at 342 n. 8. Moreover, the Supreme Court has upheld searches in schools in certain other contexts even absent particularized suspicion. *See e.g., Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002) (upholding the constitutionality of suspicionless urinalysis drug testing policy of students participating in extracurricular activities). However, analyzing the factual circumstances in the instant case, the Court concludes that it is appropriate to apply the "reasonable suspicion" standard. *Phaneuf v. Fraikin*, 448 F.3d 591, 596 (2d Cir. 2006)("*T.L.O.* held that reasonable suspicion is the governing standard . . . ."); *see also Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993) ("[A] search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation.").

_____

[13] As noted *infra*, *T.L.O.* made clear that it was not deciding whether individualized suspicion was necessarily required for the search at issue there, but rather found that such suspicion existed and was sufficient to satisfy the Fourth Amendment. 469 U.S.

17

standard should be applied to review the constitutionality of school searches conducted by school authorities in conjunction with law enforcement agents, other circuit courts have still applied the *T.L.O.* reasonableness standard to those situations. *See, e.g., Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) ("[W]e apply the reasonableness standard articulated in *New Jersey v. T.L.O.* to school seizures by law enforcement officers.") (internal citation omitted); *Shade v. City of Farmington, Minn.*, 309 F.3d 1054, 1061 (8th Cir. 2002) (noting that the *T.L.O.* reasonableness standard was appropriate for a search initiated by school officials but conducted by law enforcement agents off of school grounds because a school official made the initial decision to search the student "in furtherance of the school's interest in maintaining a safe learning environment, and because they asked officers to assist them in furtherance of that interest"); *Cason v. Cook*, 810 F.2d 188, 193 (8th Cir. 1987) (applying *T.L.O.* to search of a student by a school official working in conjunction with law enforcement personnel); *Tartar v. Raybuck*, 742 F.2d 977, 983 (6th Cir. 1984) (applying a "reasonable cause" standard to a search for drugs on a student initiated by school officials and conducted by law enforcement agents when the student refused to submit to the search);[14] *Johnson v. City of Lincoln Park,* 434 F. Supp. 2d 467, 475-76 (E.D. Mich. 2006) ("While it is true that in *T.L.O.*, the Court did *not* address the question of what standard would apply when a search is conducted by school officials *in conjunction with or at the behest of* law enforcement agencies and expressed no opinion on that subject, the Sixth Circuit and other courts that have considered this issue, have found that

the *T.L.O.* standard is the appropriate standard to apply to school searches done by police officers, as well as school officials.") (citation omitted) (collecting cases); *Martens v. District No. 220, Bd. of Educ.*, 620 F. Supp. 29, 32 (N.D. Ill. 1985) (applying *T.L.O.* to search conducted by police officer of high school student where "the record ... indicates that [the police officer] had nothing to do with developing the facts that prompted [the Dean of Students] to detain [the student] in her office" and the officer did not direct school officials to detain and search [the student]"); *see also M.D. v. Smith,* 504 F. Supp. 2d 1238, 1245 (M.D. Ala. 2007) ("When police are involved in searches initiated by school officials or where police involvement in the search is minimal, most courts have applied *T.L.O.*'s reasonable-grounds test . . . .") (citation omitted).

This Court finds the analysis in the above-referenced cases persuasive and concludes that the *T.L.O.* standard should apply to the situation here where it is undisputed that the school authorities made the initial decision to interview and search K.V. and then called the Nassau County Police to assist them after K.V. refused to consent to the search.[15] To hold otherwise would potentially discourage school administrators from seeking the assistance and expertise of the police in a school's effort to address criminal and potentially dangerous situations that may be rapidly unfolding on school property. Neither the Fourth Amendment itself, nor the

---

[14] Although *Tartar* preceded *T.L.O.*, the Sixth Circuit applied the same reasonableness standard and the case was cited with approval in the *T.L.O.* decision. 469 U.S. at 332 n. 2, 341 n. 6.

[15] This Court emphasizes that its conclusion is limited to the undisputed facts in this case and does not address the situation where, unlike the circumstances here, the search is initiated and conducted by law enforcement officers on their own on school property, rather than in conjunction with, or at the direction of, school officials.

jurisprudence of the Supreme Court and Second Circuit interpreting the Fourth Amendment, requires such an absurd result in the context of this case. The record provides absolutely no evidence that the school officials' actions were used as a pretext by the police officer to circumvent the warrant and probable cause requirements; to the contrary, it is clear that the decisions to detain and search were made by the school officials and the police officer was merely assisting the school in conducting the search. Therefore, because the school officials initiated the search of K.V. pursuant to the school's interest in "maintaining a safe learning environment" and requested the assistance of a law enforcement agent in furtherance of that goal, the Court will review the search of K.V. as conducted by the school, in conjunction with a law enforcement agent, under the *T.L.O.* reasonableness standard.[16]

### 2. Application

The Court, applying the reasonableness standard, will now examine the evidence in the record regarding the search of K.V. conducted by the defendants on February 14, 2006. As set forth below, given the undisputed facts, the Court concludes as a matter of law that the "reasonableness" standard of *T.L.O.* is satisfied.

### a. The Search of K.V.'s Belongings

Plaintiff alleges that defendants violated K.V.'s Fourth Amendment rights by searching first his belongings, then his outer clothing, and finally his ankles and the waistband of his pants. As noted *supra*, plaintiff does not dispute that K.V. was spotted by a teacher, Mr. Boyd, in the vicinity of the third floor boys' bathroom soon after a fire was set there. It is also undisputed that, after making eye contact with Mr. Boyd, K.V. pulled up the hood of his sweatshirt and covered the lower part of his face before continuing to walk away from Mr. Boyd at a quickened pace without speaking to him.

The following additional facts are also undisputed: After Mr. Boyd informed Lando that he had seen K.V. coming around the corner from the hallway where the fire occurred, Lando asked Mr. Boyd to bring K.V. to his office. Lando informed K.V. that he intended to search his belongings for evidence of his involvement in the fire and, when K.V. refused to submit to the search, Lando informed him that, if he did not, a law enforcement officer would be called to the scene to conduct the search. Lando subsequently, in the presence of Officer Howell, searched K.V.'s backpack and discovered marijuana seeds in K.V.'s backpack.[17] Viewing these facts in the light

---

[16] However, even assuming *arguendo* that the more stringent "probable cause" standard applied to the second search of K.V. because it was arguably conducted in part by the police officer (lifting K.V.'s pants leg), the Court concludes that there was probable cause to conduct that search based upon finding the marijuana seeds in the backpack, as described *infra*.

[17] Although K.V. stated in his deposition that Lando also found rolling paper in the backpack (K.V. Dep. at 120), Lando suggested in his deposition that the rolling paper was found later in K.V.'s wallet. (Lando Dep. at 118-19.) The Court, construing the facts most favorably to plaintiff, will assume (as requested by plaintiff in paragraph 52 of Plaintiff's 56.1 Statement) that the rolling paper was found later in the wallet. However, the Court notes that, under either version of the facts, the defendants' conduct was lawful under the Fourth Amendment. In other words, for the reasons discussed below, a search of the wallet at the time of the initial search of the backpack or the later search of K.V.'s person would have been supported

most favorable to the plaintiff, the Court determines as a matter of law that the search of K.V.'s backpack was justified at the inception by reasonable suspicion and was reasonably related in scope to the basis for the search.

"[A] search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation." *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993). Moreover, the court must review "the totality of the circumstances, looking first at those that might have created a reasonable suspicion that such a search was justified at its inception" and must base that review "on only those facts known to the school officials prior to the search." *Phaneuf v. Fraikin*, 448 F.3d 591, 597 (2d Cir. 2006) (footnote omitted) (citations omitted).

Based on the undisputed facts that the defendants knew at the time of the search, the search of K.V.'s belongings was justified at its inception. First, K.V. was in the vicinity of the fire at the time of the alarm. Second, although plaintiff argued that K.V. pulled up his hood and covered the lower part of his face to ward off the smell of the smoke from the nearby fire, it is undisputed that he did so after encountering a teacher in the immediate vicinity of the fire. Regardless of K.V.'s intent, K.V.'s proximity to the fire coupled with the objective behavior that could evidence an attempt to disguise his identity from a teacher provided reasonable suspicion to defendants that he might have been responsible for setting the fire. Thus, the search of his belongings (including a backpack) for evidence of his involvement in the fire was supported by reasonable suspicion based on the undisputed

facts and justified at its inception under the Fourth Amendment. Although plaintiff argues that K.V.'s conduct is also consistent with trying to avoid breathing in smoke from the bathroom, the existence of such a potential innocent explanation does not alter the Fourth Amendment analysis when the suspicion of the school administrator was reasonable under the circumstances, and not an unparticularized suspicion or hunch. *See T.L.O.*, 469 U.S. at 346 ("Because the hypothesis that T.L.O. was carrying cigarettes in her purse was itself not unreasonable, it is irrelevant that other hypotheses were also consistent with the teacher's accusation [that T.L.O. had been smoking in the lavatory].")

The Court now turns to the question of whether the search of K.V.'s belongings was reasonable in scope and not excessively intrusive. Defendants believed that K.V. set the fire in the third floor boys' bathroom and so a basic search of his belongings for evidence of his involvement, such as matches or accelerants, was directly related to that suspicion. Further, courts have sanctioned far more invasive searches in the school setting based on similar suspicions. *See, e.g., Cornfield*, 991 F.2d at 1319 (finding no Fourth Amendment violation when a plaintiff with a history of disciplinary problems was caught outside of the school building in violation of school rules and school officials, noticing a "bulge" in student's pants and suspecting him of "crotching" drugs, strip-searched him the next day without parental consent); *Rhodes v. Guarricino*, 54 F. Supp. 2d 186, 192-93 (S.D.N.Y. 1999) (finding no Fourth Amendment violation when defendants searched students' hotel rooms after smelling marijuana in the hotel hallway outside of the rooms).

---

by reasonable suspicion and was reasonable in scope under the Fourth Amendment.

In short, the search of K.V.'s belongings (such as his backpack) was supported by reasonable suspicion, and was a minimally invasive action reasonably related to determining whether or not he was responsible for the fire. The Court concludes that they were not excessively intrusive so as to constitute a violation of K.V.'s rights under the Fourth Amendment. *See, e.g., Johnson v. City of Lincoln Park,* 434 F. Supp. 2d at 476 (granting summary judgment for defendants and finding that student's Fourth Amendment rights were not violated when a school administrator summoned a police liaison officer to assist in persuading a student to turn over a prohibited item and to conduct a pat-down search to obtain the prohibited item); *Martens v. Dist. No. 220, Bd. of Educ.,* 620 F. Supp. 29, 31-32 (N.D. Ill. 1985) (granting summary judgment for defendants in lawsuit brought by high school student against school for alleged Fourth Amendment violation where police officer asked student to empty his pockets based upon anonymous tip). Thus, the undisputed facts demonstrate that, as a matter of law, the search was consistent with the Fourth Amendment.

### b. The Search of K.V.'s Outer Garments and Person

The Court next determines whether summary judgment is warranted as to the subsequent search of K.V.'s outer garments and parts of his person, which took place after the discovery of the marijuana seeds in his personal belongings. As with the search of his backpack, the critical facts regarding this next search are undisputed and demonstrate that summary judgment in defendants' favor is warranted under the *T.L.O.* standard.

After recovering marijuana seeds from K.V.'s belongings (and given that he had suspended K.V. for marijuana use in the past),

Lando suspected that K.V. might have marijuana on his person and decided to further search him. Accordingly, Lando told K.V. he wanted to remove his shoes, socks, sweatshirt, and lift up his pants legs. At the direction of Lando and Officer Howell, K.V. did so and, according to plaintiff, Officer Howell lifted up K.V.'s pants legs to expose his lower legs. K.V. was also directed to lift the bottom of his t-shirt to expose his waistband.[18] At that time, Lando and Officer Howell observed a bulge in K.V.'s waistband and they ordered him to remove the object causing the protrusion, which turned out to be a bag containing several smaller bags of marijuana.

Plaintiff cites to *Phaneuf v. Fraiken* and *N.G. v. Connecticut* as support for her argument that the "intrusive" nature of this "strip search" warranted a higher degree of reasonable suspicion at its inception. The Court, however, disagrees with plaintiff's initial premise that the search conducted was in fact a "strip search" and notes that the facts of those two cases differ significantly from those in this instance; the plaintiff in *Phaneuf* was asked to lift her shirt, remove her skirt

---

[18]  Plaintiff maintains that K.V. felt this action to constitute a "strip search." The Court recognizes that a high degree of suspicion is required for a strip search. *Phaneuf,* 448 F.3d at 596 ("Although *T.L.O.* held that reasonable suspicion is the governing standard, the reasonableness of the suspicion is informed by the very intrusive nature of a strip search, *N.G. v. Connecticut,* 382 F.3d 225, 234 (2d Cir. 2004), requiring for its justification a high level of suspicion."). However, as discussed below, it is undisputed by the parties that plaintiff was never asked to remove his shirt or his pants and so the Court finds that he was not subjected to a strip search. *See N.G.,* 382 F.3d at 228 n. 4 ("'Strip search' is often used as an umbrella term that applies to all inspections of naked individuals.").

completely and pull her undergarments away from her body. 448 F.3d at 594. Likewise, the plaintiffs in *N.G.* were asked to remove all articles of clothing. 382 F.3d at 228. K.V. was never asked to remove his shirt or pants, and therefore, unlike *Phaneuf* and *N.G.*, the level of intrusiveness of K.V.'s removal of his shoes, socks, and sweatshirt and lifting of his pants legs and t-shirt did not require a high degree of suspicion, only a reasonable suspicion, which existed here.[19]

Thus, based on the undisputed facts regarding K.V.'s proximity to the fire, his behavior in the hallway, and the subsequent discovery of marijuana seeds in K.V.'s backpack, defendants had reasonable suspicion to suspect that a search of K.V.'s outer garments and person would yield evidence of a violation of the school's prohibition on drug possession, as well as potential evidence regarding the fire. Moreover, the Court concludes, as a matter of law given these undisputed facts, that the search of K.V.'s shoes, socks, and sweatshirt, as well as the exposure of his ankles and pants waistband, were reasonable at the inception and reasonably related to the objective of the search.[20]

In sum, based upon the *undisputed* facts present at the time of the searches of K.V.'s backpack and person, the defendants had reasonable grounds for suspecting that the searches would produce evidence of an infraction of a school rule or policy, as well as evidence of a crime. These searches, which occurred in the same time frame, were reasonable at their inception, were reasonably related to the objectives of the search, and were not excessively intrusive when balancing K.V.'s age in the context of the nature of the alleged infraction and defendants' strong interest in protecting the safety and welfare of its students, including preventing fires in the school and preventing drug possession or use in the school. Accordingly, these searches were reasonable under the circumstances and did not violate K.V.'s Fourth Amendment rights as a matter of law. Thus, summary judgment as to plaintiff's Fourth Amendment claim is warranted.

## C. Qualified Immunity for the Individual Defendants[21]

The individual defendants argue that, even assuming *arguendo* that the actions giving rise to plaintiff's complaint did violate the Fourth and Fourteenth Amendments, they are entitled

---

[19] As noted *supra*, even if a higher degree of suspicion were warranted here, it existed based on the undisputed facts.

[20] Although plaintiff argues that defendants violated school policy in conducting the search, including the policy regarding strip searches, or should have waited for K.V.'s parent to arrive, those contentions do not affect the legal analysis here. As a threshold matter, it is entirely unclear that the defendants violated school policy. More importantly, even assuming *arguendo* that they did, such violations do not provide a basis for concluding that they violated the Fourth Amendment. In other words, since the conduct was justified under the Fourth Amendment for the reasons discussed *supra*, any purported violations under school policy do not independently provide a basis for relief under Section 1983 under

the Fourth Amendment. Similarly, it is irrelevant whether K.V. consented to the searches because, as discussed *supra*, the searches were justified under the Fourth Amendment without his consent.

[21] Municipalities, including school districts, "are not entitled to qualified immunity for their actions, even where the individual officers who acted on the municipality's behalf would be." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 109 (2d Cir. 2006). However, as noted *infra*, the claim against the municipality in the instant case fails for other reasons.

to the defense of qualified immunity. For the reasons set forth below, the Court agrees.

### 1. Legal Standard

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).

As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (quotation marks omitted)). Thus, qualified immunity is not merely a defense, but is "an entitlement not to stand trial or face the other burdens of litigation." *Forsyth*, 472 U.S. at 526. Accordingly, courts should determine the availability of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The Second Circuit has held that under the doctrine of qualified immunity, "a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal citations omitted).

With respect to the summary judgment stage in particular, the Second Circuit has held that courts should cloak defendants with qualified immunity at this juncture "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required.") (citations and quotation marks omitted); *Stancuna v. Sherman*, No. 3:07 civ 00491, 2008 U.S. Dist. LEXIS 49059, at *18 (D. Conn. June 27, 2008) ("Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. As the Second Circuit has held, [w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical.") (citation and quotation marks omitted).

### 2. Application

In *T.L.O.*, the Supreme Court stated, "[w]e do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school

authorities." 469 U.S. at 342 n. 8. Specifically, the Court noted that "[b]ecause the search of T.L.O.'s purse was based upon an individualized suspicion that she had violated school rules, . . . we need not consider the circumstances that might justify school authorities in conducting searches unsupported by individualized suspicion." *Id.* Subsequently, recognizing a "special need," in *Vernonia*, the Supreme Court upheld the random, suspicionless drug testing of students involved in extracurricular activities. 515 U.S. 646; s*ee also Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002) ("'In certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion.'") (quoting *Nat'l Treasury Employees Union v. Von Raabe*, 489 U.S.656, 668 (1989)).

Although the level of suspicion required can vary in a school depending on the type of search and the circumstances, there is no question, as noted *supra*, that the law has clearly established that "young people do not 'shed their constitutional rights' at the schoolhouse door." *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (holding that students temporarily suspended from public school have a property and liberty interest that qualifies them for protection under the Due Process Clause) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). More specifically, it is clearly established, at least since *T.L.O.*, that searches of students must be analyzed under the reasonableness standard. *See Phaneuf*, 448 F.3d at 595 (noting that, in *T.L.O.*, "the Supreme Court applied the Fourth Amendment 'reasonableness' standard to a search of a student by school administrators"); *see also MacWade v. Kelly*, 460 F.3d 260, 267 (2d Cir. 2006) ("As the Fourth Amendment's text makes clear, the

concept of reasonableness is the 'touchstone of the constitutionality of a governmental search.'") (quoting *Earls*, 536 U.S. at 828). In other words, "[a]lthough the meaning of 'unreasonable searches and seizures' is different in the school context than elsewhere, it is nonetheless evident that there must be some basis for initiating a search. A reasonable person could not believe otherwise." *Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp. 2d 622, 641 (E.D. Pa. 2006); *see also Greanleaf v. Cote*, No. 98 civ 250, 2000 WL 863217, at *3 (D. Me. Mar. 3, 2000) ("[Student] had a clearly established right to be free from an unreasonable search of her belongings by Defendant"); *Sostarecz v. Misko*, No. 97 civ 2112, 1999 WL 239401, at *5 (E.D. Pa. March 26, 1999) (holding that "*T.L.O.*'s point is clear that school officials are not permitted to unreasonably search a student's person or her belongings" and denying qualified immunity where student was strip searched); *Konop v. Northwestern Sch. Dist.*, 26 F. Supp. 2d 1189, 1201 (D.S.D. 1998) ("The reasonableness standard set forth in *T.L.O.* was clearly established and should have been applied by defendants."). Thus, an individual does not avoid liability for an objectively unreasonable search performed on a student merely because the exact factual scenario presented was not examined and held unconstitutional by prior courts. *See Bell v. Marseilles Elementary Sch.*, 160 F. Supp. 2d 883, 890 (N.D. Ill. 2001) ("Although the law must be clear in the particular factual context at issue for qualified immunity to be inapplicable, this does not mean a case scenario exactly like the one at hand must have been addressed by courts in the past. Such a rigid requirement would be equivalent to granting school agents absolute immunity and, thus, would swallow the qualified immunity rule. More general similarities are sufficient as long as they provide adequate warning that a particular

behavior would be illegal.") (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

In short, this Court concludes that it was clearly established by the Supreme Court that, at the time of K.V.'s search, searches of students must be conducted under the "reasonableness" standard under the Fourth Amendment.[22] *See, e.g., Phaneuf*, 448 F.3d at 596 (remanding case to district court to determine whether the individual defendants were entitled to qualified immunity after joining sister circuits in concluding that the reasonableness standard announced by the Supreme Court in *T.L.O.* should be applied to strip searches of students and finding that the search at issue lacked the requisite suspicion). Therefore, in the instant case, the Court will examine whether or not it would have been objectively reasonable for the defendants to believe that their conduct in this case comported with the "reasonableness" standard.

Although the Court found that the searches of K.V.'s belongings, outer garments and parts of his person were constitutional based on the undisputed facts, defendants would be entitled to qualified immunity on those searches even if such searches had violated the Fourth Amendment. As noted *supra*, the undisputed facts demonstrate that K.V. was spotted in the immediate vicinity of the fire soon after the fire alarm sounded, exhibiting behavior that a reasonable individual could construe as suspicious. Given those undisputed facts, it was objectively reasonable to conclude that their conduct in searching K.V.'s backpack was supported by reasonable suspicion and satisfied the *T.L.O.* standard. Similarly, it was objectively reasonable for defendants to believe that the search of K.V.'s outer garments and parts of his person, which was conducted by a school official in concert with a law enforcement agent only after evidence of marijuana possession/use was discovered in K.V.'s personal belongings, was supported by reasonable suspicion and constitutional under the *T.L.O.* standard. *See Zieper v. Metzinger,* 474 F.3d 60, 71 (2d Cir. 2007) ("[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'") (quoting *Hunter,* 502 U.S. at 229 (internal quotations omitted)); *see also Sutton v. Duguid,* No. 05 civ 1215, 2007 WL 1456222, at *7 (E.D.N.Y. May 16, 2007) ("Even assuming *arguendo* that

---

[22] If a heightened standard applied to the search here because the school conducted the searches in conjunction with law enforcement (which this Court concludes is not the law), qualified immunity would still protect the defendants from application of the heightened standard because such a right is not clearly established. In particular, neither the Supreme Court nor the Second Circuit had clearly established, at the time of K.V.'s search (or even to this date), that the *T.L.O.* reasonableness standard does not apply to student searches initiated by school authorities but performed in concert with law enforcement agents. Therefore, it would not be clearly established that the participation of a law enforcement agent in that search would subject defendants to a higher Fourth Amendment standard. Accordingly, if their conduct was justified under the *T.L.O.* standard and not a purported heightened "probable cause" standard, defendants would be entitled to qualified immunity. *See, e.g., Wofford v. Evans,* No. 02 civ 0762 (JLK), 2003 WL 24254757, at *4-*5 (W.D. Va. Sept. 8, 2003) (holding that defendant was entitled to qualified immunity where defendant had questioned plaintiff regarding a gun brought to school, because "case law does not establish the applicable standard to be applied in school seizures – or searches – conducted by law enforcement" and defendant's questioning was reasonable under the circumstances). In any event, the Court concludes that defendants would be entitled to qualified immunity even under the "probable cause" standard given the undisputed facts in this case.

defendants are entitled to qualified immunity on plaintiff's Fourth Amendment claim based on the initial stop because defendants, at a minimum, had arguable reasonable suspicion existed to stop plaintiff.")

In sum, based upon existing case law, it was objectively reasonable for defendants to believe that their conduct did not violate K.V.'s rights in performing the search of K.V.'s belongings, outer garments and parts of his person. Accordingly, even assuming *arguendo* that these searches were unreasonable under the Fourth Amendment, the individual defendants are entitled to qualified immunity.

### D. Municipal Liability

Although any theory of municipal liability is unclear from the complaint, to the extent plaintiff also seeks to assert a § 1983 claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), against the District, that claim also cannot survive summary judgment.

Under *Monell*, a municipal entity may be held liable under § 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." 436 U.S. at 694-95; *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989), and *Monell*, 436 U.S. at 692-94). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). A policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226

(quoting *Kern*, 93 F.3d at 44). However, a municipal entity may only be held liable where the entity *itself* commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see also Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs it has sanctioned, led to an independent constitutional violation.").

In the instant case, as the Court finds as a matter of law on summary judgment that no constitutional violation was committed against plaintiff by the individual defendants, *see supra*, no *Monell* claim can lie against the District pursuant to § 1983.[23] *See, e.g., Segal*, 459 F.3d at 219 ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *accord Vippolis v. Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who . . . subjected, or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights.")

_____

[23] In any event, summary judgment would also be warranted in the District's favor because plaintiff has failed to proffer any evidence of a policy, custom, or failure to train, that led to any alleged constitutional violation. Similarly, any claims against defendant Bernstein based on his supervision of Lando and authorization of the search also do not survive summary judgment because Lando committed no constitutional violations as a matter of law.

(citing 42 U.S.C. § 1983). Therefore, to the extent plaintiff is attempting to assert a *Monell* claim against the District, the Court grants defendants' motion for summary judgment as to such claim.[24]

## V. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court shall enter judgment accordingly and close this case.

The attorney for plaintiff is Lee Nuwesra, Esq., Law Office of Lee Nuwesra, 1623 Unionport Rd., Suite 101, Bronx, NY 10462. The attorneys for defendants are John P. Sheahan, Esq. and Kelly A. Reape, Esq., Guercio & Guercio, 77 Conklin Street, Farmingdale, NY 11735.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: October 31, 2008
Central Islip, NY

* * *

_____

[24] Likewise, with regard to the individual defendants, to the extent that they are being sued in their official capacities, the claims against them are duplicative of the *Monell* claim against the District. *Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 n. 10 (S.D.N.Y. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)); *see also Monell*, 436 U.S. at 691 (holding that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). Therefore, the *Monell* claims against the individual defendants in their official capacities also do not survive summary judgment.